IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEWART P. NEWELL,                         *
300 South Point Drive, #1004
Miami Beach, FL 33109,                     *

        Plaintiff,                    *        CASE NO: _____

v.                                         *

METROPOLIS DEVELOPMENT                     *
COMPANY, LLC,
1327 14th Street N.W., Suite 300           *
Washington, DC 20005,

    Serve:  Robert Scott Pannick, Manager
           1327 14th Street N.W., Suite 300     *
           Washington, DC 20005
                             *

and                                        *

ROBERT SCOTT PANNICK,                      *
3204 Rowland Place N.W.
Washington, DC 20008,                      *

        Defendants.

*     *     *     *     *     *     *     *     *     *     *     *     *

**COMPLAINT FOR DAMAGES, DECLARATORY JUDGMENT,
AND INJUNCTIVE RELIEF**

      Stewart P. Newell, by and through his attorneys James A. Sulivan, Jr., Richard A. DeTar,

and Miles & Stockbridge P.C., hereby files suit against Metropolis Development Company, LLC

and Robert Scott Pannick, and in support hereof states as follows:

**Parties**

      1.      Metropolis Development Company, LLC (the "Company") is a District of

Columbia limited liability company with its principal place of business at 1327 14th Street N.W.,

Suite 300, Washington, D.C. 20005.

2.      Robert Scott Pannick ("Pannick") is an individual residing at 3204 Rowland Place N.W., Washington, D.C. 20008.  Pannick owns a fifty-percent (50%) interest in the Company.

3.      Stewart P. Newell ("Newell") is an individual residing at 300 South Point Drive, #1004, Miami Beach, FL 33109.  Newell owns a fifty-percent (50%) interest in the Company.

### Jurisdiction and Venue

4.      This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391.

### Facts

6.      The Company is a limited liability company pursuant to Section 10-101 et seq. of the Corporations Article of District of Columbia Code.  The Company is a developer engaged in the business of acquiring, financing, developing, leasing, managing, and operating real property in the District of Columbia and the surrounding metropolitan area.

7.      Prior to the inducements made to Newell by Pannick and the Company in the Redemption Agreements (as defined below), Newell served as manager and tax matters partner of the Company.

8.      On September 29, 2003, Pannick and the Company agreed to purchase all of Newell's right, title, and interest in and to his Membership Interest and Percentage Interest in the Company ("Newell's Interest"), pursuant to the terms and conditions of the September 29, 2003 Redemption Agreement ("Redemption Agreement"), the purpose of which was to buy-out Newell's Interest entirely so that Pannick could become the sole owner and manager of the

Company.  A copy of the Redemption Agreement is attached hereto as Exhibit 1 and incorporated herein by reference.

9.      Pursuant to Section 1 of the Redemption Agreement, Newell's Interest was to be terminated when Newell was paid the full Amount Owed (as defined below).

10.     In addition, the Parties agreed that upon execution of the Redemption Agreement, Newell would no longer receive any share in the Company's profits.

11.     The Parties further agreed in the Redemption Agreements that Newell's employment as manager and tax matters partner of the Company would be terminated on the "Effective Date", defined as February 6, 2004.  Between execution of the Redemption Agreement (September 29, 2003) and the Effective Date (February 6, 2004), Newell received a monthly salary of Ten Thousand Dollars ($10,000) as compensation for continuing to act as the Company's manager and tax matters partner until the termination of his employment on the Effective Date.

12.     The Company and Pannick agreed to pay Newell One Million Six Hundred Eleven Thousand Dollars ($1,611,000) as consideration for Newell's agreement to: (1) relinquish his fifty percent (50%) interest in the Company upon payment of the Amount Owed, (2) relinquish his right to receive profits from the Company immediately, and (3) terminate his employment with the Company on the Effective Date.  The Redemption Agreement also contains a provision calling for an adjustment in the redemption amount based on the value of the Company on December 1, 2003.

13.     On February 7, 2004, pursuant to the First Amendment to Redemption Agreement (the "First Amended Redemption Agreement"), a copy of which is attached hereto as Exhibit 2, the Parties agreed to increase the redemption amount to Two Million Two Hundred Seven

Thousand Nine Hundred Seventy-Two Dollars ($2,207,972) (the "Amount Owed"). The Redemption Agreement and the First Amended Redemption Agreement shall be collectively referred to as the "Redemption Agreements."

14.    Pursuant to the Redemption Agreements, Newell was provided with security that the Amount Owed would be paid by way of a priority distribution of all of the Company's "Available Cash", defined as "all cash distributions received by the Company with respect to Company Projects." The "Company Projects" are those four development projects that were in progress when the Redemption Agreement was executed, as identified in Exhibit A to the Redemption Agreement.

15.    The purpose of allocating the Available Cash from Company Projects to Newell was to ensure that he received the proceeds from Company Projects unaffected by the positive or negative financial impact of future Company operations, overhead and future projects, including the Metropole Project, because Newell was not to be a participant in such future projects or have any control over future management of the Company or Company Projects.

16.    Pursuant to the Redemption Agreements, Available Cash from Company Projects excluded only two specified categories of revenues: (1) the first Five Hundred Thousand Dollars ($500,000)[1] from Company Projects, and (2) service fees paid to the Company in connection with its management agreements for each Company Project. All other Available Cash was to be paid to Newell on a first priority basis until the Amount Owed has been paid in full to Newell.

17.    The Parties agreed that should any portion of the Amount Owed remain unpaid on December 31, 2004, interest would begin to accrue at the rate of ten percent (10%) per annum, compounded quarterly on the unpaid balance.

---

[1] This first $500,000 was also to be paid to Newell pursuant to a separate agreement for the sale of land relating to the Metropole Project, a non-Company Project.

18.     Pursuant to the Redemption Agreements, the Amount Owed plus interest was to be paid in full to Newell no later than December 31, 2005.

19.     Company Projects consist of four separate developments in Washington, D.C., each with retail condominium space on the ground floor and residential condominiums on the remaining floors.

20.     Substantially all of the residential condominiums in all four Company Projects have been sold, and most of the retail condominium space has either been leased or sold.

21.     The Company began experiencing cash flow problems as a result of excessive Company overhead and other development projects undertaken subsequent to the four Company Projects, including, in particular the Metropole Project, which has been a substantial cash drain.

22.     At the direction of Pannick, Metropolis diverted Available Cash (in the form of cash revenues, corporate opportunities, and/or cash generated from borrowings against equity associated with rights or title the Company had acquired to real property associated with Company Projects) from Newell and has instead used proceeds or equity from Company Projects to cover overhead and to fund other development projects apart from Company Projects.

23.     Pannick and/or the Company took as a distribution a valuable retail condominium unit within Lofts 14, a Company Project, which is currently being used by the Company as its sales center for other projects, without compensation to Newell.  Pannick and the Company either have or are intending to obtain additional financing by pledging this condominium unit as security and have or will use such loan proceeds for overhead and/or other projects unrelated to Company Projects.  By taking this condominium unit from a Company Project in lieu of cash, Pannick and the Company have diverted what should have been Available Cash for their benefit and to the detriment of Newell.

24.    By way of illustration of proceeds from Company Projects that have been diverted from Newell, one Company Project, the Cooper Lewis Condominiums located at 14th & P Streets ("Project C") involved an arrangement whereby the Company, as an insider, owned a purchase option on the ground floor retail space for a pre-determined below-market price. The Company procured a lease from PNC Bank at a per square foot price that enabled the Company to simultaneously purchase the ground floor retail space for approximately One Million Six Hundred Thousand Dollars ($1,600,000) and sell it to a third-party for approximately Four Million Four Hundred Thousand Dollars ($4,400,000). Of the approximately Two Million Eight Hundred Thousand Dollars ($2,800,000) in Available Cash generated from this retail space in Project C, Newell was paid only Five Hundred Fifty Thousand Dollars ($550,000), and at Pannick's direction, approximately Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) was diverted from the priority payments belonging to Newell and used elsewhere.

25.    At Pannick's direction, the Company also diverted Available Cash from a Company Project known as the Langston Hughes Condominium Project ("Langston Project"), owned 50% by Pannick and 50% by the Company. All of the residential condominiums and retail space in the Langston Project have been sold and generated Available Cash to the Company in excess of One Million Five Hundred Thousand Dollars ($1,500,000). Newell received only $500,000 from the Available Cash associated with Langston Project.

26.    The Company has exercised an option to acquire certain retail space in another Company Project, Lofts 14 II ("Lofts 14 II"), which is valuable as a result of a lease with Federal Express. The Company intended to generate cash from the Federal Express retail space through the sale of that condominium unit. When the Federal Express unit was sold on November 9,

2007, the Company paid $900,000 to Newell from the proceeds of that sale, only after and only because, Newell hired counsel to protect his rights under the Redemption Agreements.

27.    The Company exercised a similar option to acquire another retail space in Lofts 14 II, which is valuable as a result of a lease recently entered into with The Garden District.  The Company intends to generate cash from the Garden District retail space through either a sale of that retail space and/or borrowing from a bank based on the equity associated with that space, either of which will result in Lofts 14 II generating significant Available Cash to the Company that will be diverted from Newell to pay other Company expenses, obligations, and/or distributions unrelated to Company Projects.

28.    Pursuant to, *inter alia*, the Redemption Agreements and his duties as sole manager of the Company, Pannick had and continues to have the obligation to ensure that all monies and opportunities available to the Company from Company Projects (except as set forth in paragraph 14 above) were, and in the future are, segregated from all other monies and debts of the Company, and distributed as a priority payment to Newell.  Instead, Pannick and the Company have commingled monies and assets available to the Company from Company Projects with other income and debts of the Company and/or otherwise diverted cash, other assets and loan proceeds into other projects rather than making the required priority payments to Newell.

29.    Had Pannick and the Company allocated all the Available Cash from Company Projects to Newell, as required under the Redemption Agreements, the Company and Pannick would have satisfied their obligations to Newell in compliance with the terms of the Redemption Agreements.

30.    Prior to May 2007, Pannick and the Company had paid Newell One Million Dollars ($1,000,000) toward the Amount Owed pursuant to the Redemption Agreements.

31.     On May 8, 2007, Newell hired counsel to make a formal demand upon Pannick and the Company for payment of the Amount Owed (the "Demand Letter"), which totaled One Million Six Hundred Ninety Thousand Six Hundred Seventy-Four Dollars ($1,690,674) at that time.  As a result of the demand and related efforts by Newell's counsel, the Company paid Newell $900,000 on November 9, 2007.  A copy of Newell's May 8, 2007 Demand Letter is attached hereto and incorporated herein as Exhibit 3.

32.     In the Redemption Agreements, Pannick and the Company also agreed to keep separate books and records for each of the four Company Projects.

33.     The Parties expressly agreed that until Newell is paid the full Amount Owed, Newell is to receive all reports and tax information required to be provided by the Manager to Members under the LLC Agreement and the reports given to lenders or partners in Company Projects.

34.     Prior to receipt of the Demand Letter, Pannick and the Company had failed and refused to provide Newell with the reports and tax information required to be provided by the Manager to Members under the LLC Agreement and the reports given to lenders or partners in Company Projects.

35.     Due to Pannick's and the Company's failure to provide the information identified in paragraphs 33 and 34 above, Newell made demand for same in the Demand Letter.  To date, none of the required reports have been provided to Newell by the Company or Pannick.

## COUNT I
### Breach of Contract for Damages
### (Defendants Pannick and Company)

36.     Paragraphs 1 through 35 are incorporated herein by reference as if set forth in full in this Count I.

37.    Pursuant to the Redemption Agreements, Pannick and the Company were required to pay Newell the full Amount Owed no later than December 31, 2005.

38.    To date, Pannick and the Company have made partial payment of the Amount Owed to Newell of One Million Nine Hundred Thousand Dollars ($1,900,000)[2].

39.    The unpaid principal due and owing to Newell is Three Hundred Seven Thousand Nine Hundred Seventy-Two Dollars ($307,972).

40.    The unpaid interest due and owing to Newell was Four Hundred Eighty-Two Thousand Seven Hundred Two Dollars ($482,702) as of the date of the Demand Letter (May 8, 2007), and remains due and owing from Pannick and the Company to Newell.  Interest continues to accrue on the unpaid balance at the rate of ten percent (10%) per annum, compounded quarterly, such that as of November 21, 2007, total interest due to Newell is Five Hundred Seventy-One Thousand Nine Hundred Fifty-Three Dollars ($571,953).

41.    The failure of Pannick and the Company to pay Newell the amount due and owing, which includes the unpaid principal amount of Three Hundred Seven Thousand Nine Hundred Seventy-Two Dollars ($307,972) plus interest, prior to the December 31, 2005 Outside Distribution Date is a material breach of the Redemption Agreements.

42.    The diversion of assets and other corporate opportunities by Pannick and the Company away from Newell also constitutes a material breach of the Redemption Agreements.

43.    The failure of Pannick and the Company to provide Newell with financial reports and tax information and the reports given to lenders or partners in Company Projects, as required under the agreements, is also a material breach Redemption Agreements.

---

[2] Newell has received a total of $1,950,000; the extra $50,000 was a payment under a separate contract unrelated to the Redemption Agreements.  This $50,000 was part of the sale of land at 15th & P Streets for the Metropole project.

**WHEREFORE**, Plaintiff Newell requests that this Court enter judgment against Pannick and the Company, jointly and severally, in the amount of Eight Hundred Seventy-Nine Thousand Nine Hundred Twenty-Five Dollars ($879,925) plus pre- and post-judgment interest, costs, attorneys' fees and such other and further relief as this Court deems just and proper.

**COUNT II**
**(In the alternative to Count I)**
**Tortious Interference with Contract**
**(Defendant Pannick)**

44.    Paragraphs 1 through 43 are incorporated herein by reference as if set forth in full in this Count II.

45.    Pursuant to the Redemption Agreements, the Company is contractually obligated to make priority payments to Newell of all Available Cash attributable to Company Projects without regard to expenses or obligations of the Company associated with overhead or future projects of the Company.

46.    At all times relevant hereto Pannick had knowledge of the Redemption Agreements and knew that the Company owed a contractual duty to Newell to make payment of all Available Cash from Company Projects to Newell as a first priority payment without regard to expenses or obligations of the Company associated with the Company's overhead or future projects unrelated to Company Projects.

47.    Without legal justification, Pannick intentionally and improperly interfered with the Company's performance of the Redemption Agreements by inducing the Company to breach said contracts by diverting away from Newell Available Cash and other corporate opportunities relating to Company Projects and to other operational expenses and obligations of the Company.

48.     Pannick intentionally induced the Company to breach its contractual obligations to Newell for the improper purpose of benefiting his ownership interests in the Company and his other personal interests to the detriment of Newell.

49.     To further his own personal interests, Pannick also misrepresented to Newell the amount of Available Cash and other assets available from Company Projects to pay Newell.

50.     As a result of Pannick's inducements to the Company and misrepresentations to Newell, Newell has suffered financial damages in that he has not been paid the Amount Owed, and Available Cash from Company Projects has been dissipated such that the Company may no longer have the financial ability to make payment to Newell from Company Projects or otherwise.

**WHEREFORE**, Plaintiff Newell requests that this Court enter judgment against Pannick in the amount of Eight Hundred Seventy-Nine Thousand Nine Hundred Twenty-Five Dollars ($879,925) plus pre- and post-judgment interest, costs, attorneys' fees and such other and further relief as this Court deems just and proper.

### COUNT III
**Declaratory Judgment**
**(Defendants Pannick and Company)**

51.     Paragraphs 1 through 50 are incorporated herein by reference as set forth in full in this Count III.

52.     Pursuant to the Redemption Agreements, Pannick and/or the Company are obligated to pay Newell the Amount Owed from all Available Cash from Company Projects.

53.     Pannick and the Company have acquired and resold or refinanced real estate associated with Company Projects, and utilized the proceeds therefrom for various Company and

personal activities, thereby diverting Available Cash and other financial benefits from Company Projects away from Newell.

**WHEREFORE**, Plaintiff Newell requests that this Court enter a declaratory judgment finding that:

(a)     such proceeds and related financial benefits constitute Available Cash under the Redemption Agreements with respect to the matters raised in this Complaint;

(b)     Pannick and the Company are in material breach of the Redemption Agreements;

(c)     the Redemption Agreements be specifically performed by Pannick and the Company;

(d)     Newell is entitled to a first priority payment of all Available Cash and other property rights available to the Company from the date of execution of the Redemption Agreement until Newell receives payment in full of the Amount Owed plus interest; and

(e)     Newell is entitled to such other and further relief as the nature of this case requires.

Respectfully submitted,

/s/ James A. Sullivan, Jr.

_____

James A. Sullivan, Jr.
(D.C. Bar No. 475145)
Miles & Stockbridge P.C.
11 North Washington Street, Suite 700
Rockville, MD 20850
Telephone (301) 762-1600
Facsimile (301) 762-0363
E-mail:  jsullivan@milesstockbridge.com

Of Counsel:

/s/ Richard A. DeTar

_____

Richard A. DeTar
Miles & Stockbridge, P.C.
101 Bay Street
Easton, MD 21601
Telephone (410) 820-0224
Facsimile (410) 822-5450
E-mail:  rdetar@milesstockbridge.com

Attorneys for Stewart P. Newell

## REDEMPTION AGREEMENT

**THIS REDEMPTION AGREEMENT** (the "Agreement") is made and entered into this ____ day of September, 2003, by and among METROPOLIS DEVELOPMENT COMPANY, LLC, a District of Columbia limited liability company (the "Company"), ROBERT SCOTT PANNICK ("Pannick"), an individual residing at _3101 Klingle St. NW Wash, d.c._ , and *STEWARD D. NEWELL* ("Newell"), an individual residing at _1235 Dhot SlSt Ave NW NT Wash, DC._ .

### RECITALS:

**A.**     Pannick and Newell are all of the Members of the Company. The Company was formed pursuant to Articles of Organization filed in the District of Columbia Department of Consumer and Regulatory Affairs on April 21, 1998. The affairs of the Company are governed by that certain Limited Liability Company Agreement dated October 1, 2002 (the "LLC Agreement"). All terms used in this Agreement in a capitalized fashion and not otherwise defined herein shall be deemed to have the meanings assigned to them in the LLC Agreement.

**B.**     As of the date of this Agreement, Pannick holds a fifty percent (50%) Percentage Interest in the Company and Newell holds a fifty percent (50%) Percentage Interest in the Company.

**C.**     The Company was formed by Pannick and Newell to acquire, finance, develop, lease, manage and operate real property located in the District of Columbia and in the surrounding metropolitan area. As of the date of this Agreement, the Company has interests in certain real property and related projects as set forth on Exhibit "A" (the "Company Projects").

**D.** '     The Company and Newell have agreed that the Company will terminate all of Newell's right, title and interest in and to his Membership Interest and Percentage Interest in the Company on the terms and conditions set forth below.

**E.**     Prior to the execution of this Agreement, the Company distributed equally to Pannick and Newell the Company's entire right, title and interest in and to its 100% membership interest in 15th and P LLC. Thereafter, Pannick acquired Newell's membership interest in 15th and P LLC pursuant to an Assignment and Purchase Agreement entered into by and between Pannick and Newell.

**F.**     Payments of the Redemption Amount (defined below) are intended by the parties hereto to be treated as payments in exchange for Newell's interest in the Company's property as set forth in Section 736(b) of the Internal Revenue Code of 1986, as amended.

**NOW, THEREFORE,** in consideration of the Recitals set forth above, which are hereby incorporated into and made a material part of this Agreement, the mutual premises contained below, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Company, Pannick and Newell agree as follows:

Word 45647416 7

EXHIBIT

1

1.    <u>Termination of Interest</u>.  Pursuant to this Agreement, the Company will terminate Newell's entire right, title and interest in and to his Membership Interest and Percentage Interest in the Company (the "Interest").  Newell agrees to execute and deliver all documents that counsel for the Company deems necessary or appropriate for the Company to terminate the Interest.  The Interest shall automatically be deemed terminated at midnight on the date the Company distributes in full to Newell the Redemption Amount (defined below) in accordance with the terms and conditions of this Agreement.  Upon execution of this Agreement, the Company will no longer allocate to Newell any share of the Company's Profits and Losses (as defined in the LLC Agreement).  The LLC Agreement is hereby amended to allocate to Pannick one hundred percent (100%) of all future Profits and Losses.

2.    <u>Redemption Amount</u>.  Subject to Paragraph 3 below, the Company shall distribute to Newell in redemption of his Interest the sum of One Million Six Hundred Eleven Thousand Dollars ($1,611,000) (the "Redemption Amount").

3.    <u>Timing</u>.  The Company shall distribute the Redemption Amount to Newell as follows:

a.    Notwithstanding anything in the LLC Agreement to the contrary, prior to making any distributions to Pannick of Available Cash (defined below) the Company shall make priority distributions of its Available Cash to Newell until the balance of the Redemption Amount is distributed in full.  For purposes of this Agreement, the term Available Cash shall mean all cash distributions received by the Company with respect to Company Projects excluding (i) the first Five Hundred Thousand Dollars ($500,000) available from Company Projects shall be distributed to Pannick in connection with his purchase of Newell's interest in 15th and P PLLC, and (ii) amounts paid to the Company in connection with its fee agreements for each of the Company Projects.  Furthermore, Pannick shall agree to contribute to the Company any distributions received by him from Uptown Partners LLC to be used by the Company as payment to Newell of the Redemption Price.  Newell shall have no right to receive any distributions that arise from monies received by the Company from projects other than the Company Projects, and any Available Cash from such other projects shall be distributed, reserved or otherwise allocated by Pannick in his sole discretion as Manager; *provided, however,* that Pannick shall cause the Company to (i) keep monies received from Company Projects separate and apart from monies received from any other projects and (ii) maintain separate books and records for each Company Project and any other projects the Company may have.  The Deferred Distribution shall be fully distributed not later than December 31, 2005 (the "Outside Distribution Date").  The Company will distribute the Redemption Amount from Available Cash within a reasonable time after the date the Company receives funds from transactions involving the Company Projects, but in any event no later than ten (10) business days after receipt.

b.    The Redemption Amount shall be adjusted as follows:  1)  If the values shown on any of the Project Pro Formas (as defined in <u>Paragraph 6</u> below) materially increase or decrease during the period from the date of this Agreement through December

2

1, 2003, then the Redemption Amount shall be adjusted by an amount equal to fifty percent (50%) of the amount of such material increase or decrease. 2) The Redemption Amount shall be reduced by the amount of any distributions by the Company to Newell that are made during the period from the date of this Agreement through the last day Newell serves as Manager. If Pannick and Newell are unable to agree on the amount of the adjustments hereunder, such disagreement shall be settled by arbitration in accordance with the rules of the American Arbitration Association for accelerated arbitration then in effect and judgment on the award may be entered in any court having jurisdiction.

      c.    The Company will endeavor to distribute the Redemption Amount to Newell in such a manner that will minimize the income tax burden to Pannick and Newell.

    4.    **Interest.**  The Redemption Amount shall be interest-free; *provided, however,* that if the Company has not distributed the entire Redemption Amount to Newell on or before December 31, 2004, then interest shall commence to accrue on any unpaid portion of the Redemption Amount on January 1, 2005, at the rate of ten percent (10%) per annum until the Company has distributed the entire Redemption Amount.

    5.    **Management.**  Newell has been serving as Manager of the Company and as "tax matters partner" since the Company's formation. Newell shall continue to serve as Manager and "tax matters partner" subject to the terms and conditions of the LLC Agreement until the Effective Date. For purposes of this Agreement, the term "Effective Date" shall mean the date which is the later to occur of (i) the start date for construction of the development of the 1400 Church Street Condominium Project, or (ii) January 2, 2004. Newell's power and authority to act on behalf of the Company, serve or hold himself out as the Manager of the Company, or otherwise legally bind the Company shall terminate automatically upon the Effective Date without further action by the Company, Newell or Pannick, at which time Pannick shall for all purposes be deemed to be the Manager and the "tax matters partner" of the Company, with sole power and authority to act on behalf of and legally bind the Company. Newell shall continue to receive salary at the rate of Ten Thousand Dollars ($10,000.00) per month as his sole compensation from the Company during the remainder of his term as Manager, and shall not pay to himself any other amounts from Company funds other than reimbursement of expenses incurred in the normal course of Company business.

    6.    **Certain Matters Regarding Operation of the Company.**  The business affairs of the Company are to be run for the duration of Newell's term as Manager in accordance with (i) the *pro formas* for each of the three Company Projects set forth on Exhibit "A" (the "Project Pro Formas"), copies of which are attached hereto as Exhibit "B"; and (ii) the Operating Budget currently in effect, a copy of which is attached hereto as Exhibit "C". Any material changes or material deviations from any Project Pro Forma or the Operating Budget shall be actions that require unanimous approval of the Members as a Major Decision pursuant to Section 8.7 of the LLC Agreement. Newell shall cooperate with Pannick to the extent reasonably requested in

3

transferring all bank account authority (including, but not limited to, signing authority) to Pannick effective as of the date Newell ceases to be Manager. Except with respect to any material change from the Project Pro Formas or the Operating Budget as set forth in this Section 6, upon the Effective Date, Newell's right to vote with respect to any Major Decisions, as that term is defined in the LLC Agreement, shall be terminated.

7.    **Reporting; Audit Rights.**  Commencing on the date Pannick becomes Manager and continuing until such time as the Redemption Amount has been distributed in full, Pannick shall provide to Newell all reports and tax information required to be provided by the Manager to Members under the LLC Agreement. In addition, Pannick will provide Newell with copies of all reports given to lenders or partners in Company Projects. Not more often than quarterly during the period between (i) the date Newell ceases to be Manager pursuant to Paragraph 5 above and (ii) the date the Redemption Amount is distributed in full, Newell shall have the right, upon not less than ten (10) days' written notice to Pannick, to audit the books and records of the Company with respect to the Company Projects during normal business hours.

8.    **Indemnifications.**    Newell and Pannick each agree to indemnify and hold harmless the Company and one another as follows:

a.    Newell shall indemnify, hold harmless and defend the Company and Pannick from and against any and all losses, claims, damages, liabilities, joint or several, expenses (including, without limitation, attorneys fees and other legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, that relate to the business activities of the Company as set forth in the LLC Agreement during the period he served as Manager if it is established that (i) the act or omission of Newell was material to the matter giving rise to the proceeding and either was committed in bad faith or was the result of active and deliberate dishonesty; (ii) Newell actually received an improper personal benefit in money, property or services; or (iii), in the case of any criminal proceeding, Newell had reasonable cause to believe that the act or omission was unlawful. In addition, Newell shall indemnify and hold harmless the Company and Pannick from and against damages for any action taken by him negligently or not in good faith in connection with the examination by the Internal Revenue Service of the Company's Federal partnership tax return or the determination, protest, adjustment or adjudication of any Federal or state income tax liability of any Member resulting from the Company during any tax year in which he was Manager.

b.    Pannick shall indemnify, hold harmless and defend the Company and Newell from and against any and all losses, claims, damages, liabilities, joint or several, expenses (including, without limitation, attorneys fees and other legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, criminal, administrative or investigative, that relate to the business activities of the Company as set forth in the LLC Agreement during the period he served as Manager if it is established that (i) the act or omission of Pannick was material to the matter giving rise to the proceeding and either was committed in bad faith or was the result of active and deliberate dishonesty; (ii) Pannick

4

actually received an improper personal benefit in money, property or services; or (iii), in the case of any criminal proceeding, Pannick had reasonable cause to believe that the act or omission was unlawful. In addition, Pannick shall indemnify and hold harmless the Company and Newell from and against damages for any action taken by him negligently or not in good faith in connection with the examination by the Internal Revenue Service of the Company's Federal partnership tax return or the determination, protest, adjustment or adjudication of any Federal or state income tax liability of any Member resulting from the Company during any tax year in which he was Manager.

c.    Pannick and Newell each have provided personal non-competition agreements in connection with the Mid-City Development Company, LLC project. Each of them shall indemnify, hold harmless and defend the Company and each other from and against any and all losses, claims, damages, liabilities, joint or several, expenses (including, without limitation, attorneys fees and other legal fees and expenses), judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings arising under or relating to a breach of such personal non-competition agreement by the indemnifying party. In addition, Pannick and Newell have provided U. S. Property Development Company Inc. ("USP"), a partner in Mid City, indemnification agreements covering certain guarantee agreements provided by USP to a lender under Company Projects. Pannick agrees to indemnify and hold Newell harmless with respect to Newell's obligations under the indemnification agreements in the event that (i) USP seeks to enforce its indemnification agreements against Pannick and Newell, (ii) such enforcement action arises with respect to any matter or event contemplated under USP's guarantees to the lender of a Company Project, and (iii) such matter or event occurs after the Effective Date.

9.    **Acknowledgements; Certain Waivers.**  This Agreement and the Redemption Amount are the result of arms-length negotiations between the Company, Pannick and Newell and that each of them enters into this Agreement of their own free will, having had the opportunity to consult with independent legal counsel of their choosing and understands each and every one of the terms contained in this Agreement. Pannick and Newell each waives the requirements of Article XIII of the LLC Agreement with respect to Permitted Transfers, and acknowledge and agree that upon the consummation of the transaction contemplated in this Agreement, at which time Pannick will be the Company's sole Member, the Company's status as a partnership will be terminated for federal tax purposes. In addition, Pannick and Newell each waives any rights either of them may have under Article XIV of the LLC Agreement with respect to buy-sell.

10.    **No Implied Modifications.**  Except as expressly modified herein, the LLC Agreement remains in full force and effect as originally signed, *provided, however,* that if any provision of this Agreement conflicts with the terms and conditions of the LCC Agreement, the provisions of this Agreement shall be controlling.

11.    **Entire Agreement.**  Other than the Miscellaneous Issues described in Exhibit D hereto, there are no other oral or written agreements among the parties hereto with respect to the subject matter of this Agreement, and this Agreement constitutes the entire Agreement among

the Company, Pannick and Newell with respect to the termination of all of Newell's right, title and interest in and to the Company and the Company Projects.

      12.    **Governing Law; Jurisdiction.**  This Agreement shall be governed by and interpreted in accordance with the laws of the District of Columbia, without regard to or application of the District's principles of conflict of laws. The Company, Pannick and Newell hereby consent to the jurisdiction of the courts of the District of Columbia with respect to any dispute among them arising from or relating to this Agreement and the consummation of the transaction contemplated herein.

      13.    **Counterparts; Facsimile.**  This Agreement may be executed in multiple counterparts, all of which when taken together shall be deemed to be one and the same instrument. Facsimile signatures shall be deemed to be original signatures.

      14.    **No Recordation.**  The Company, Pannick or Newell shall not attempt to record this Agreement or any memorandum or summary of this Agreement in the records of any jurisdiction in which the Company, directly or indirectly, does business.

      15.    **Further Approvals.**  This Agreement shall be of no force and effect until such time as USP provides its written consent to this Agreement.

*[Signatures are on the next page.]*

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the date first set forth above.

METROPOLIS DEVELOPMENT COMPANY, LLC, a District of Columbia limited liability company

By: _____

Stewart P. Newell, Manager

ROBERT SCOTT PANNICK

_____

STEWART P. NEWELL

_____

7

## FIRST AMENDMENT TO REDEMPTION AGREEMENT

**THIS FIRST AMENDMENT TO REDEMPTION AGREEMENT** ("First Amendment") is signed and effective for all purposes as of February 7, 2004, by and among (i) **METROPOLIS DEVELOPMENT COMPANY, LLC**, a District of Columbia limited liability company ("Company"), (ii) **ROBERT SCOTT PANNICK**, an individual residing at 3204 Rowland Place, N.W., Washington, D.C. ("Pannick"), and (iii) **STEWART P. NEWELL**, an individual residing at 1425 Rhode Island Avenue, N.W., Washington, D.C. ("Newell").

### RECITALS:

A.    The Company, Pannick and Newell are parties to that certain Redemption Agreement dated September 29, 2003 ("Original Agreement"). A true and correct copy of the Original Agreement is attached to this Amendment as Exhibit A.

B.    Pursuant to the Original Agreement, the Company and Newell have agreed, among other things, that the Company will terminate all of Newell's right, title and interest in and to his Membership Interest and Percentage Interest in the Company on the terms and conditions set forth in the Original Agreement.

C.    The Company, Pannick and Newell desire to modify the terms of the Original Agreement as expressly set forth below in this First Amendment.

**NOW, THEREFORE**, in consideration of the Recitals set forth above, which hereby are incorporated into and made a material part of this First Amendment, the mutual premises contained below, and other good and valuable consideration, the receipt and sufficiency of which hereby are acknowledged, and intending to be legally bound, the Company, Pannick and Newell hereby agree as follows:

1.    **Defined Terms.** Each capitalized term used but not otherwise defined in this First Amendment shall have the meaning given to such term in the Original Agreement.

2.    **Allocation of Profits and Losses.** The fourth (4th) and fifth (5th) sentences of Paragraph 1 of the Original Agreement hereby are deleted, and the following is substituted in place thereof:

> "Commencing as of January 2, 2004, the Company will no longer allocate to Newell any share of the Company's Profits and Losses (as defined in the LLC Agreement). The LLC Agreement hereby is amended to allocate to Pannick one hundred percent (100%) of all Profits and Losses accruing or arising on and after January 2, 2004."

#1151594.4

EXHIBIT

2

Notwithstanding the foregoing, Newell hereby acknowledges that the Company has no obligation to make to Newell, and Newell is not entitled to receive from the Company, any distributions (whether in cash or in kind), except such distributions as are expressly required in the Original Agreement, as amended by this First Amendment, in connection with the payment of the Redemption Amount by the Company to Newell, and furthermore, Pannick agrees that Newell has no obligation to make any contributions to the Company whatsoever after the effective date hereof.

3.   **Redemption Amount.**

a.   Subsequent to the execution and delivery of the Original Agreement and prior to the date of this First Amendment, and pursuant to the provisions contained in Paragraph 3.b of the Original Agreement, the Company, Pannick and Newell agreed to adjust the Redemption Amount (as defined in the Original Agreement) by an amount equal to Five Hundred ninety Six Thousand Nine Hundred Seventy two and 00/100ths Dollars ($596,972). Accordingly, the parties hereby agree that the Redemption Amount is increased from One Million Six Hundred Eleven Thousand and 00/100ths Dollars ($1,611,000) to Two Million Two Hundred Seven Thousand Nine Hundred Seventy Two and 00/100ths Dollars ($2,207,972). From and after the date of this First Amendment, the term "Redemption Amount" shall mean Two Million Two Hundred Seven Thousand Nine Hundred Seventy Two and 00/100ths Dollars ($2,207,972), as the same may be adjusted pursuant to Section 5.h below.

b.   Paragraph 3.b of the Original Agreement hereby is deleted in its entirety, and the following is inserted in place thereof: "Intentionally Deleted."

4.   **Effective Date.**

a.   The third (3rd) sentence of Paragraph 5 of the Original Agreement hereby is deleted in its entirety, and the following is substituted in place thereof:

"For purposes of this Agreement, the term "Effective Date" shall mean February 7, 2004."

b.   The fifth (5th) sentence of Paragraph 5 of the Original Agreement hereby is deleted in its entirety.

5.   **Certain Matters Regarding USP.**

a.   The Company, Pannick and Newell acknowledge that certain of the transactions contemplated by the Original Agreement, as amended by this First Amendment, may require the consent of U.S. Property Development Corporation, a Delaware corporation ("USP"), pursuant to the terms of the Operating Agreement of Mid City Development Holding Company, LLC made as of December 24, 2002 ("Mid City Operating Agreement") by and between USP and the Company. The Company, Pannick and Newell further acknowledge that the Company and Pannick would suffer significant losses and damage, and irreparable harm, if USP were to remove the

- 2 -

Company as "Managing Member" of Mid City Development Holding Company, LLC ("Mid City") for Cause (as defined in the Mid City Operating Agreement) or otherwise, or if any of the terms of the Mid City Operating Agreement were to be breached. It is the express intent of the parties hereto that each of the Company, Pannick and Newell continue to comply in all respects with each and every covenant of and obligation imposed upon such parties pursuant to the Mid City Operating Agreement.

        b.       Notwithstanding anything to the contrary contained in the Original Agreement or this First Amendment, Newell shall continue to actively participate in the management of the Company as and to the extent expressly set forth in this Section 5.b. The Company hereby retains Newell, and Newell hereby agrees to render services to the Company, as an independent consultant to provide the services described in the immediately succeeding sentence. In such capacity as consultant, Newell shall consult with Pannick and the Company regarding the management of the Company; provided, however, that Newell shall have no power or authority to bind or otherwise obligate the Company in any way without the express written consent of the Company and Pannick in each instance. In consideration for providing the consulting services required by this Section 5.b, Newell shall be entitled to compensation at the rate of $250.00 per hour. In addition, Newell shall be entitled to minimum compensation of five thousand dollars ($5000) per month (the Consulting Fee). Any hours spent by Newell providing consulting services under this Section 5 b shall first accrue toward the $5000 per month minimum compensation, and if that amount is exceeded in any particular month will be billed at the $250 per hour rate. Notwithstanding the immediately preceding sentence, Newell's right to receive the Minimum Compensation, and the Company's obligation to pay the Minimum Compensation to Newell, shall cease on and as of the date upon which USP provides its written consent to relieve Newell of the obligations set forth in this paragraph 5b and paragraphs 5 c and d below, and as required by the Mid City Operating Agreement and as contemplated by the Original Agreement (as amended by this First Amendment).

        c.       Notwithstanding anything to the contrary contained in the Original Agreement or this First Amendment, Newell, in his capacity as consultant to the Company (as described in Section 5.b above), shall give the Project (as defined in the Mid City Operating Agreement) his first priority attention among all of his business activities, and shall remain primarily involved and devote as much time during all phases of the Project as may reasonably be required to ensure the success of the Project. To this end, Newell shall not take any full time employment until the earlier of i) USP agrees to delete this requirement from the Mid City Operating Agreements or ii) Project Completion as such is defined in the Mid City Operating agreements. Newell shall be permitted to enter into consulting agreements during this period as long as such agreements do not interfere with Newell's obligations herein ~~and ii) Newell discloses in such agreements his obligations herein.~~

        d.       Notwithstanding anything to the contrary contained in the Original Agreement or this First Amendment, unless Mid City otherwise shall unconditionally agree in writing, Newell shall not (i) compete with the Project (as contemplated in

Paragraph 2(a)(iii) of the Mid City Operating Agreement) during any period prior to Project Completion (as defined in the Mid City Operating Agreement), or (ii) otherwise take on any new real estate construction or development project (as contemplated in Paragraph 2(a)(ii) of the Mid City Operating Agreement) prior to the end of the Development Phase (as defined in the Mid City Operating Agreement), either on his own behalf or on behalf of others, that materially interferes with his efforts to ensure the timely and successful completion of the Project.

e.    Notwithstanding anything to the contrary contained in the Original Agreement or this First Amendment, no Transfer (as defined in the Mid City Operating Agreement) of the Interest as contemplated by this Agreement shall occur unless and until such time as USP provides its written consent to the Transfer of the Interest as contemplated by this Agreement. In the event that USP fails for any reason to provide such consent prior to the date upon which the full amount of the Redemption Amount shall have been paid to Newell, then Newell shall continue to hold bare legal title to the Interest for the benefit of the Company.

f.    Paragraph 15 of the Original Agreement hereby is deleted in its entirety, and the following is substituted in place thereof:

> "The termination of the Interest as contemplated by this Agreement shall not occur unless and until such time as USP provides its written consent to the termination of the Interest."

g.    Each of the Company, Pannick and Newell hereby waives for itself or himself any and all right to recover damages (whether actual, consequential, punitive or otherwise) from the other parties, to the extent such damages are caused by the failure or default of such other party or parties to comply with the provisions of this Section 5.

h.    Notwithstanding anything to the contrary contained in the Original Agreement or this First Amendment (including, without limitation, Section 5.g above), in the event Newell fails to comply with any of his obligations set forth in this Section 5, or takes any act or action in breach of his obligations set forth in this Section 5 or otherwise commits a default under this Section 5, then in such event the Redemption Amount shall automatically be decreased by an amount equal to Two Hundred Thousand and 00/100ths Dollars ($200,000.00).

i.    In addition to the Consulting Services provided by Newell as outlined in paragraph 5b, above, Newell may provide additional services (the Additional Services) to the Company at the request of Pannick. Newell shall be paid for Additional Services at the rate of $250/hour.

6.    **Ratification.** As expressly amended by this First Amendment, the Original Agreement shall remain in full force and effect in accordance with its terms.

- 4 -

7.    **Counterparts; Facsimile Signatures.**  This First Amendment (i) may be executed in any number of counterparts which, when taken together, shall constitute a single binding instrument, and (ii) may be executed by facsimile.

[signatures on following page]

IN WITNESS WHEREOF, the Company, Pannick and Newell have executed this First Amendment in multiple originals on and as of the date first above written.

METROPOLIS DEVELOPMENT COMPANY,
LLC, a District of Columbia limited liability
company

By: _____ [SEAL]
Stewart P. Newell, Manager

_____ [SEAL]
Robert Scott Pannick

_____ [SEAL]
Stewart P. Newell

- 6 -

# MILES & STOCKBRIDGE P.C.

Richard A. DeTar
rdetar@milesstockbridge.com
(410) 820-0224

May 8, 2007

## *VIA FACSIMILE AND FEDERAL EXPRESS*

Metropolis Development Company, LLC
Attention: Robert Scott Pannick, Managing Member
1327 14th Street N.W., Suite 300
Washington, DC 20005

Robert Scott Pannick
3204 Rowland Place N.W.
Washington, DC 20005

Re:    Demand for Payment and Financial Records Pursuant to Redemption Agreement

Dear Mr. Pannick:

Please be advised that we represent Stewart P. Newell ("Mr. Newell") in connection with the above-referenced Redemption Agreement and amendments thereto.  As you know, both Metropolis Development Company, LLC (the "Company") and you are obligated to Mr. Newell under that Agreement.

Pursuant to Section 3.A. of the Agreement, payment in full was to be made to Mr. Newell "not later than December 31, 2005" (the "Outside Distribution Date").  The total amount originally due to Mr. Newell pursuant to the Redemption Agreement, as amended, was Two Million Two Hundred Seven Thousand Nine Hundred Seventy Two Dollars ($2,207,972).  One Million Dollars ($1,000,000) has been paid to Mr. Newell as of this date.  Consequently, a principal balance of One Million Two Hundred Seven Thousand Nine Hundred Seventy Two Dollars ($1,207,972) remains due and owing.  In addition, pursuant to Section 4 of the Agreement interest accrues at the rate of ten percent (10%) per annum until Mr. Newell is paid in full, with interest compounding quarterly on the outstanding balance, starting on January 1, 2005.  Accordingly, interest has accrued through May 8, 2007 in the amount of $482,702, leaving a total balance due and owing as of May 8, 2007 of One Million Six Hundred Ninety Thousand Six Hundred Seventy Four Dollars ($1,690,674) .

Please also be advised that pursuant to Section 3.A. of the Agreement you are required to cause the Company to: (i) keep monies received from the "Company Projects" separate and apart from monies received from other projects and (ii) maintain separate books for each Company Project and all other projects the Company may have.  In addition, until such time as Mr. Newell is paid in full you are obligated to provide him with all reports and tax information required to be

**EXHIBIT**

**3**

Metropolis Development Company LLC
Robert Scott Pannick
5/8/2007
Page 2 of 2

M I L E S $\&$ S T O C K B R I D G E  P.C.

and all other projects the Company may have. In addition, until such time as Mr. Newell is paid in full you are obligated to provide him with all reports and tax information required to be provided by the Manager to Members under the LLC Agreement and to provide him with copies of all reports provided to lenders or partners in Company Projects. To date, both the Company and you have failed and refused to provide this information.

We are well beyond the Outside Distribution Date; accordingly, demand is hereby made for payment in full within ten (10) days from the date of this letter. I note that Mr. Newell's prior efforts to communicate with you on this matter, directly and through agents, have been unsuccessful. Mr. Newell regrets that it has become necessary to retain my services to assert his rights, but at this point it is essential that you devote your full attention to this matter.

Sincerely,

Richard A. DeTar

RAD/aje
cc:    Gladstone Consulting, Inc.

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Stewart P. Newell | Metropolis Development Company, LLC and Robert Scott Pannick |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     88888
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY) ————————
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
James A. Sullivan, Jr.
Miles & Stockbridge P.C.
11 N. Washington Street, Suite 700
Rockville, Maryland 20850
(301) 762-1600

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 2 U.S. Government Defendant
○ 3 Federal Question (U.S. Government Not a Party)
● 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ● 4 |
| Citizen of Another State | ● 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV.  CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

○ **E. General Civil (Other)**     **OR**     ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ⊙ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

28 U.S.C. Section 1332(a) –Diversity of Citizenship; Complaint for Damages, Declaratory and Injunctive Relief

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | DEMAND $ $879,925.00 <br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☐   NO ☒ |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐   NO ☒ | If yes, please complete related case form. |
|---|---|---|---|

DATE  November 26, 2007        SIGNATURE OF ATTORNEY OF RECORD  _(signature)_

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.